UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| DEANGELIS DIAMOND CONSTRUCTION, LLC, | ) ) ) |
| Plaintiff/Counter Defendant, | ) ) |
| v. | ) ) ) ) | Case No. 3:21-cv-00822<br>Judge Aleta A. Trauger |
| ROGERS MANUFACTURING CORP., | ) ) |
| Defendant/Counter Plaintiff. | ) |

## MEMORANDUM

Rogers Manufacturing Corp. ("RMC") has filed a Motion for Summary Judgment (Doc. No. 46), to which DeAngelis Diamond Construction, LLC ("DDC") has filed a Response (Doc. No. 48), and RMC has filed a Reply (Doc. No. 50). RMC's Reply purports to include a Motion to Strike (Doc. No. 50 at 1–4), to which DDC has filed a Response (Doc. No. 53). For the reasons set out herein, both motions will be denied.

## I. BACKGROUND[1]

### A. The Parties' Contract

DDC is a construction company, and RMC is a supplier of construction materials. On October 12, 2020, they entered into a Supplier Agreement for a project identified as the "Berry Farms Town Center [Apartments]." (Doc. No. 46-1 at 1.) The parties agree that the Supplier

---

[1] Unless otherwise indicated, the facts set forth herein are from RMC's Statement of Undisputed Material Facts (Doc. No. 49), DDC's Response to RMC's Statement of Undisputed Material Facts (Doc. No. 52), DDC's Statement of Additional Material Facts (Doc. No. 48-3), RMC's Response to DDC's Statement of Additional Material Facts (Doc. No. 51), and the evidentiary materials cited and relied upon by the parties.

Agreement was a "valid contract" and was "the only contract governing [RMC's] performance on" the Berry Farms project. (Doc. No. 51 ¶ 6; Doc. No. 52 ¶ 1.)

The Supplier Agreement requires DDC to pay RMC $3,743,935.00, subject to amendment, in exchange for the purchased materials and RMC's performance of certain tasks associated with providing those materials. (Doc. No. 52 ¶ 2.) The body of the Agreement, however, does not list the specific materials being purchased. (*Id.* ¶ 6.) Rather, it requires RMC to provide "all . . . material, accessories, equipment, hoisting, unloading, and permits necessary for a complete rough carpentry supply package in accordance with the Contract Documents." (Doc. No. 46-1 at 11.) Those "Contract Documents" are expressly identified and consist chiefly of plans for the buildings themselves. (*Id.* at 6.) The Agreement describes the agreed-upon price as a "negotiated lump sum subcontract amount based on the Contract Documents and this [RMC's] understanding of what is necessary to provide a complete project [S]cope of Work." (Doc. No. 46-1 at 7.)

The Agreement, however, also sets forth procedures for changes to the Scope of Work—necessitating changes in the total price—through a "change order" system. Such change orders permitted DDC to request additional "[w]ork on a time and material basis." (*Id.* at 10.) The parties agree that, prior to the conflict giving rise to this case, valid, DDC-approved change orders resulted in a revised contract price of $3,876,907.43. (Doc. No. 52 ¶¶ 2, 14.) According to DDC, the change orders and increased costs were the result of "design changes which necessitated delivery of additional materials." (*Id.* ¶ 14.)

The Supplier Agreement includes two integration clauses. The first clause appears in the contract's initial Terms & Conditions and provides that "[t]he Supplier Agreement contains the entire Agreement between the parties relating to [RMC's] performance at the Project and

2

supersedes all previous agreements between the parties whether written or oral with respect to the subject matter." (*Id.* at 4.) The second integration clause appears in the Scope of Work itself and states:

> This Subcontract and associated Scope of Work voids and supersedes all other previous agreements and proposals by the Subcontractor. All proposals and communications in association with this Scope of Work, which conflict with the description of the Work herein, are specifically rejected or withdrawn.

(*Id.* at 7.)

The Supplier Agreement states that "any controversy or claim arising out of or relating to this Supplier Agreement, or the breach thereof, shall be settled under the laws of the State of Tennessee." (Doc. No. 46-1 at 4.) It includes the following indemnity provision:

> **INDEMNITY/DUTY TO DEFEND/HOLD HARMLESS:** The work performed by [RMC] shall be at the risk of [RMC] exclusively. To the fullest extent permitted by law, [RMC] shall defend, indemnify and hold harmless [DDC], the owner of the Project and all other parties that [DDC] is required to defend, indemnify or hold harmless (collectively, the "Indemnitees") from all loss, damage and expense sustained by [DDC] and from all claims, liability and expense suffered by it by reason of any property damage (including patent and trademark rights), personal injury (including death) or other claim or action brought by any other person, firm or corporation, arising out of or in consequence of the purchase, sale or use of any of the goods, products or services referred to in this order, provided that Supplier shall have no such responsibility with respect to liability resulting solely from [DDC's] gross negligence or intentional misconduct.

(*Id.* at 3–4.)

### B. The Parties' Falling Out

The Berry Farms project progressed, and RMC did provide DDC with a substantial quantity of materials, for which DDC, in return, paid most of the contract's balance—$3,713,737.44. (Doc. No. 52 ¶ 3.) The parties disagree, however, regarding the remainder, if any, owed. DDC argues that it has validly withheld the remainder of the revised price, because RMC "breached the Supplier Agreement by failing to provide materials necessary for the project." (*Id.*

3

¶ 4.) DDC asserts that the lowered price reflects an "additional deductive change order to RMC," based on RMC's failure to provide the materials necessary to complete the project in its entirety. (*Id.* ¶ 2.)

RMC, however, says that it has provided everything that it agreed to provide. Prior to the start of work on the project, RMC produced a detailed Master Materials List that, RMC says, it understood to describe the "loose lumber . . . necessary to complete its scope of work." (*Id.* ¶ 7.) The Master Materials List is not designated as among the formal Contract Documents. RMC, however, says that it understood the List to represent what was being purchased and that it supplied those materials accordingly—in addition to other materials covered by the valid change orders—fulfilling the entirety of its obligations under the contract. (*Id.* ¶ 13.) In support of this assertion, RMC cites testimony from its Rule 30(b)(6) witness, who stated that "we shipped everything on our original list . . . everything on our original breakdown and about 13 percent more." (Doc. No. 46-3 at 58.)

DDC responds that the contract was not for RMC to provide the specific materials on a pre-project list or "breakdown," but to supply the materials necessary to complete the project as depicted in the actual, enumerated Contract Documents. DDC has filed an Affidavit of its Project Manager for the Berry Farms project, Kelly Pope, in which Pope explains that, "[b]ecause DDC is neither a structural engineer, nor a framer, nor a lumber supplier, it relied upon the expertise of the proposing companies to accurately estimate the amount and price of lumber and associated materials that would be needed to construct the Project." (Doc. No. 48-1 ¶ 6.) By paying a lump sum for whatever materials would ultimately be necessary, DDC made it so that the costs of any underestimation of the materials needed would fall on RMC, as the supplier and the party responsible for that estimate in the first place. *See Retail Builders, Inc. v. Latham*, No. M2004-

4

00771-COA-R3-CV, 2005 WL 3508013, at *10 (Tenn. Ct. App. Dec. 22, 2005) (discussing the nature of fixed-price construction contracts).

DDC points out that, in addition to the Master Materials List not being a Contract Document and therefore not being a formal part of the Scope of Work, the List also wholly omitted some items necessary for the completion of the buildings—particularly, certain necessary trusses. (Doc. No. 46-1 at 11; Doc. No. 46-4 at 2; Doc. No. 48-2 at 146–47.)

According to Pope, "[b]efore the Project was complete, and before [RMC] had delivered all of the material that was needed for a complete lumber package for the nine Project Buildings shown in the Contract Documents, [RMC] ceased and refused to continue to provide lumber to the Project." (Doc. No. 48-1 ¶ 18.) Pope says that RMC demanded over $1 million in additional payment to resume, which RMC "justified based on its assertion that its cost of performance had increased." (*Id.* ¶ 19.) DDC refused, taking the position that the Supplier Agreement set the price for the materials and that increases in price were only necessary in the event of actual design changes supported by change orders—not simply cost fluctuations. (*Id.* ¶ 20.)

RMC refused to perform any further work. Pope says that this left several buildings unfinished and in need of materials that RMC had agreed—but was refusing—to provide. (*Id.* ¶ 20.) DDC had to obtain those materials elsewhere, which, according to Pope, resulted in over $1.5 million in additional expenses. (*Id.* ¶ 22.)

Although RMC believes that DDC is mistaken in its reading of the Supplier Agreement, it raises another, purely factual issue with DDC's understanding of the situation. RMC points out that, even aside from the legal question of what the Supplier Agreement required, "DDC does not know what materials RMC caused to be delivered to the Project," because DDC did not keep an ongoing record of deliveries. (Doc. No. 52 ¶ 9.) DDC "disputes the implied assertion that

DDC was required to monitor [RMC's] delivery of materials to the project," but it does not ultimately refute the assertion that it did not keep track of the materials. (*Id.*) DDC's argument that RMC failed to provide enough materials for the project, then, is not based on a calculation in which the specific quantity of materials documented to have been provided was subtracted from the specific quantity that should have been provided. Rather, DDC is inferring the shortfall from the fact that, when RMC abandoned the project, more materials were still needed. (*Id.*)

RMC suggests that the discrepancy may be due to DDC's having used some of the materials for projects outside the scope of the Berry Farms project itself. (*Id.* ¶ 10.) There is, however, no specific evidence that any such thing occurred. Rather, RMC relies on testimony by DDC's Rule 30(b)(6) witness confirming that DDC did not keep inventory and therefore would not necessarily know, from its records, whether any such shifting of resources occurred. (*Id.* (citing Doc. No. 46-2 at 98).)

**B. This Case**

On September 28, 2021, DDC filed a Complaint against RMC in Williamson County Chancery Court. (Doc. No. 1-1.) The Complaint states two counts. Count I is for breach of contract, based on the allegation that RMC "fail[ed] to furnish the materials and supply the services that it was required to furnish pursuant to the" Supplier Agreement. (*Id.* ¶ 12.) Count II is a claim for indemnity, based on the assertion that RMC has a contractual and/or common law obligation to indemnify DDC for the costs it was forced to incur due to RMC's breach. (*Id.* ¶¶ 15–18.)

RMC removed the case to this court based on the diversity of the parties' citizenship.[2] (Doc. No. 1.) Shortly thereafter, it filed a counterclaim for breach of contract, based on DDC's

---

[2] RMC is a privately held corporation incorporated and based in Louisiana (Doc. No. 6 at 1), and DDC is an LLC with members in Florida, Tennessee, and Alabama (Doc. No. 10 at 3).

failure to pay the remaining $163,169.99 that RMC asserts that DDC owes. (Doc. No. 7 ¶¶ 28–30.)

On June 30, 2023, RMC filed a Motion for Summary Judgment regarding all claims. (Doc. No. 46.) That motion failed to comply with this court's Local Rules in at least two ways. First, RMC failed to include a separate Statement of Undisputed Material Facts supported by citations to the record, as required by L.R. 56.01(b). Second—and much less importantly—RMC relied entirely on the body of its motion to present its arguments, rather than filing a separate memorandum in support, as required by L.R. 7.01(a)(2).

On July 21, 2023, DDC filed a Response in opposition to the motion. (Doc. No. 48.) DDC argues first that the court should deny the motion based on RMC's noncompliance with the Local Rules. (Doc. No. 48 at 2.) DDC argues next that, "even if the Motion had been properly filed, served, and supported, it is devoid of merit . . . ." (*Id.*) DDC filed a Statement of Additional Material Facts in support of its Response, as permitted by L.R. 56.01(c)(3)—although those facts were not, technically speaking, "additional," given that RMC's own facts had not yet been filed. (Doc. No. 48-3.) On July 28, 2023, RMC belatedly filed the required original Statement of Undisputed Material Facts, to which DDC has since responded—creating, ultimately, something akin to the set of documents anticipated by the Local Rules, albeit filed out of order. (Doc. No. 49; Doc. No. 52.)

On August 3, 2023, RMC filed a document described as "Defendant's Reply to Plaintiff's Response to Motion for Summary Judgment and Motion to Strike Evidence." (Doc. No. 50.) That filing includes the arguments that one would expect from a reply brief, but it also has a subsection with the header "Motion to Strike." RMC again failed to comply with this court's requirement, in L.R. 7.01(a)(2), that a motion be supported by a separate memorandum. In any

7

event, RMC asks the court to strike various sections of the Pope Affidavit, which, RMC asserts, "is vague and conclusory in nature, and often makes improper legal conclusions contrary to plain contractual terms." (Doc. No. 50 at 4.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Issues Related to Parties' Statements of Undisputed Facts

#### 1. RMC's Violation of Local Rules

A party seeking summary judgment must "show[] that there is no genuine dispute as to any material fact," such that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 of the Federal Rules of Civil Procedure identifies two ways in which a moving party can show that a fact is beyond dispute: (1) "citing to particular parts of materials in the record" that establish the asserted fact; or (2) "showing . . . that an adverse party cannot produce admissible evidence to support" any alternative factual conclusion. Fed. R. Civ. P. 56(c)(1). Aside from that basic structure, Rule 56 is largely silent regarding how the information supporting a motion for summary judgment should be formatted or presented.

Silence of the Federal Rules on a particular detail, however, is not necessarily authorization for attorneys to proceed however they wish. Congress has expressly granted each federal court the power to "prescribe rules for the conduct of [its] business," and those rules are binding. 28 U.S.C. § 2071(a). This court's Local Rule 56.01 sets forth how a party should present its efforts to meet Rule 56's requirements regarding the facts and record—specifically, through a separate document formatted to facilitate a mandatory, direct response by the other party to each allegedly undisputed fact, either conceding the fact or demonstrating that the fact is contested with "specific citation to the record." L.R. 56.01(c). The purpose of this refined procedure is to encourage parties to be as clear as possible about the nature and sources of their factual disagreements and the evidence on which they intend to rely in support of their respective positions. *See McClure v. Johnson*, No. 1:15-CV-00035, 2019 WL 858679, at *6 (M.D. Tenn. Feb. 22, 2019), *report and recommendation adopted*, No. 1:15-CV-00035, 2019 WL 1316028

(M.D. Tenn. Mar. 22, 2019).

It is beyond dispute that RMC failed to timely comply with this court's Local Rules. Its failure, however, has been mostly rectified, and DDC has not identified any basis for concluding that denial of the motion is, in such a situation, absolutely required. RMC has now presented its facts in the prescribed form, and DDC has had the opportunity to respond. DDC has not identified any additional, unremedied prejudice to it by RMC's error. The court, accordingly, will decline to deny the motion based on its procedural noncompliance and will, instead, consider the motion on the merits.

### 2. RMC's Motion to Strike

RMC offers various reasons why the court, in its view, should strike portions of the Pope Affidavit. Most of those reasons, however, have one particularly notable thing in common: they each could have been presented as convincingly, and significantly more efficiently, without resorting to a motion to strike in the first place. Indeed, a motion to strike evidence offered in support of a motion for summary judgment is not even a type of motion specifically contemplated by the Federal Rules of Civil Procedure. *See Wimberly v. Clark Controller Co.*, 364 F.2d 225, 227 (6th Cir. 1966) (noting that the Rules' discussion of motions to strike " does not make provision for testing the legal sufficiency of affidavits"). Rather, Rule 56 envisions that a party who does not wish to concede an asserted fact, despite that fact's having been supported by citation to the record, will do one of three things: (1) attempt to show, through citation to the same and/or other materials in the record, that the fact "is genuinely disputed," Fed. R. Civ. P. 56(c)(1); (2) object that "the material cited to support [the challenged] fact cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2); or (3) seek deferral, discovery, or other appropriate relief in order to permit that party to respond appropriately, once

10

an adequate record has been assembled, Fed. R. Civ. P. 56(d). Moreover, insofar as a party's objection is really about the moving party's reasoning, not its assertions of fact, that reasoning can be critiqued in the party's briefing itself. There is, in other words, no shortage of opportunities for making arguments in connection with a Rule 56 motion without filing additional, secondary motions. A party still *can* file a motion to strike—there is nothing forbidding it—but the preexisting structure for litigating Rule 56 motions will typically be sufficient.

This case is no exception. Each of RMC's arguments could have been presented either through a simple objection, a factual response, or an argument in its briefing. Indeed, most of the points it seeks to make do not even make much sense in the context of a motion to strike. For example, some of RMC's objections merely argue that, if the court adopts RMC's reading of the Supplier Agreement, then DDC's evidence of nonperformance under its alternative reading of the Agreement will be irrelevant. (Doc. No. 50 at 4.) That is a straightforward substantive argument that could have been (and was) presented through the ordinary briefing process. While RMC is not the first litigant to channel such arguments into an unnecessary motion to strike, the fact that it is not alone in that approach does not make the tactic itself any more advisable. *See Reed v. City of Memphis, Tennessee*, 735 F. App'x 192, 197 (6th Cir. 2018) (discussing practice of filing motions to strike in connection with Rule 56 and noting that a court can, without formally striking any assertion, accomplish the same end simply by disregarding the assertion in its analysis).

The court, accordingly, will not strike any aspect of the Affidavit, nor will the court address every argument raised in the unnecessary motion individually, without consideration of whether the objected-to portion of the Affidavit is actually necessary to the resolution of the

11

pending motion. Insofar as any portion of Pope's Affidavit does end up playing a role in the court's analysis, the court will address any objection, as needed. Then, once the court has ruled on the Motion for Summary Judgment, all of the remaining aspects of the Motion to Strike will be moot and will be denied.

**B. Breach of Contract**

In Tennessee, a claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach of contract. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). Neither party in this case disputes the first element. The evidence before the court is plainly sufficient to permit a finder of fact to conclude that, if RMC did breach the contract by failing to provide the materials required, then DDC can also satisfy the third element by establishing that it was required to spend additional funds on replacement materials. The parties' disagreement, therefore, largely comes down to whether DDC can establish breach.

That question, in turn, hinges, in significant part, on which party is correct in its interpretation of the contract. If RMC is correct that the contract only required it to provide the materials on the Master Materials List, then there is not evidence sufficient to support a finding of breach, because there is no evidence of any item on that list that was not delivered. If, in contrast, DDC is correct that the contract required RMC to provide all materials reasonably required by the construction specifications, even if those materials were omitted from the Master Materials List, then DDC's evidence that it had to seek out materials elsewhere could support a finding of breach.

In interpreting a contract, the role of the court is to "ascertain and give effect to the intent

of the parties." *Spirit Broadband, LLC v. Armes*, No. M2015-00559-COA-R3-CV, 2017 WL 384248 at * 6 (Tenn. Ct. App. Jan. 27, 2017) (quoting *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009)). It should, to the extent possible, do so based upon the "usual, natural, and ordinary meaning of the contract language." *Planters Gin Co. v. Federal Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 889–90 (Tenn. 2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide." *Id.* (citations omitted).

The plain language of the Supplier Agreement is that RMC agreed to provide "all . . . material, accessories, equipment, hoisting, unloading, and permits necessary for a complete rough carpentry supply package in accordance with" the Contract Documents. (Doc. No. 46-1 at 11.) "Contract Documents" is capitalized, suggesting that it is a defined term, and the Agreement includes a clear, prominent list of what those defined "Contract Documents" are. (*Id.* at 6.) That list does not include the Master Materials List. There is, therefore, no reading of the plain language of the Supplier Agreement that would permit the Master Materials List to supersede the actual Contract Documents in defining the scope of materials that RMC was required to provide.

RMC argues that, even if the Master Materials List was not an expressly identified "Contact Document," it was still an accurate representation of what RMC believed that the project required, and the Supplier Agreement acknowledged that the parties were relying on that understanding. There is no plausible reading of the Supplier Agreement's language, however, that would support the conclusion that, where the actual needs of the project exceeded RMC's initial estimate, the initial estimate would prevail. Indeed, even if every single person involved

13

with the project had believed, at one time, that the Master Materials List amounted to an accurate representation of what the project would require, it would not change DDC's rights under the contract, because DDC expressly purchased the materials that would actually, reasonably be needed—not merely some fixed amount that it expected to need. Although the Agreement does acknowledge the parties' reliance on RMC's expertise, it nowhere states that any estimate that RMC made based on that expertise would prevail over the actual needs of the project.

The fact that DDC did not keep closer tabs on the materials it was receiving does not provide an alternative basis for awarding summary judgment to RMC. A reasonable finder of fact could conclude, based on the evidence presented, that DDC's need to obtain additional materials to complete the project establishes that RMC, more likely than not, supplied less than was necessary to complete the agreed-upon Scope of Work, resulting in breach. In RMC's Motion to Strike, it objects to aspects of the Pope affidavit attesting to that shortfall, but none of those objections suggests that Pope or another qualified witness would be unable to present the underlying facts through admissible evidence. *See* Fed. R. Civ. P. 56(c)(2). Although the evidence in the record is not incompatible with the possibility that some materials may have nevertheless ended up elsewhere, that bare possibility does not entitle RMC to summary judgment on the ground that no reasonable finder of fact could find any shortfall whatsoever.

The possibility that some materials might have been provided but not used on the Berry Farms project may well be relevant to damages, if RMC can support that possibility with more than speculation. For the purposes of RMC's request for summary judgment, however, all that matters is whether DDC has identified evidence sufficient to permit a finder of fact to find some shortfall, which it has. The court, therefore, has no basis for granting RMC summary judgment as to breach of contract.

**C. Indemnity**

Tennessee has historically recognized causes of action for both express and implied indemnity. "Express indemnity obligations arise from the contracts between the parties, and implied indemnity obligations, whether called equitable or contractual, are imposed by law . . . ." *Triangle Am. Homes v. Harrison*, No. E2009-01954-COA-R3CV, 2011 WL 4863713, at *9 (Tenn. Ct. App. Oct. 13, 2011) (quoting *Winter v. Smith*, 914 S.W.2d 527, 541–42 (Tenn. Ct. App. 1995)). Indemnification claims "arise frequently in construction litigation," where "[t]heir impact can be significant because indemnification shifts the entire burden of loss or responsibility" for an underlying misunderstanding or event. *Id.* (quoting *Winter*, 914 S.W.2d at 452).

DDC argues that it can prevail on an express indemnity claim arising out of the Supplier Agreement. DDC argues that the express language of the indemnity provision entitles it to recovery for any "loss, damage and expense. . . arising out of or in consequence of the purchase, sale or use of any of the goods, products or services referred to' in the Supplier Agreement." (Doc. No. 46-1 at 3.) The full language of the provision is more complicated than that and might arguably be susceptible to narrower readings—particularly regarding which language modifies (and narrows) "loss, damage, and expense." RMC, however, has not pursued any such argument, so the court will treat DDC's interpretation of the language as uncontested for the purposes of summary judgment.

RMC has instead chosen to focus on whether DDC has actually identified evidence sufficient to show damages for which indemnity would be owed pursuant to DDC's reading of the language. RMC's argument to this effect is largely the same as its argument regarding breach

15

of contract: RMC just does not believe that it provided less than it had agreed to provide. That argument fails for this purpose, as well, because DDC has interpreted the contract correctly and provided evidence sufficient to support the conclusion that RMC failed to provide required materials, resulting in damages.

## IV. CONCLUSION

For the foregoing reasons, RMC's Motion for Summary Judgment (Doc. No. 46) and Motion to Strike (Doc. No. 50) will be denied.

An appropriate Order will enter.

ALETA A. TRAUGER
United States District Judge